IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>AGRIDIME LLC (a Texas corporation), JOSHUA LINK and JED WOOD,<br><br>Defendants. | **COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF**<br><br>JURY TRIAL DEMANDED<br><br>Case No.:<br><br>Judge: |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its undersigned attorneys, alleges as follows:

## I.   SUMMARY

1. From 2021 through approximately December 11, 2023 (the "Relevant Period"), Defendant Agridime LLC ("Agridime"), and its co-founders, Defendants Joshua Link and Jed Wood (collectively, Defendants), engaged in a scheme to defraud thousands of customers in at least fourteen states throughout the United States by soliciting, accepting and using customer funds to pay other customers in the nature of a Ponzi scheme, rather than for the purposes Agridime represented those funds would be used, in connection with contracts of sale of a commodity in interstate commerce (i.e., the customer's purchase of cattle). During the Relevant Period, upon information and belief, Defendants received more than $161 million from over two thousand victims for the purpose of purchasing cattle.

2. During the Relevant Period, Agridime operated an online platform that purportedly allowed customers to buy and sell cattle, and pitched victims with the prospect of guaranteed annual rates of return between at least 15% and 20%. As advertised, Agridime's

1

cattle purchase program afforded customers the opportunity to buy and sell cattle without the actual day-to-day care of the cattle, or as Agridime stated in solicitation materials, purchasers of livestock would "make money raising cattle without having to do all the work."

3. In the Agridime cattle program, the customer supposedly bought a head of live cattle, typically for $2,000, and Agridime was supposed to take care of the actual feeding and caring for the cattle via farmers with whom Agridime partnered, until the cattle was ready to be processed and the beef sold. In exchange for their $2,000 livestock purchase price, customers were guaranteed in solicitations, among other things, a return of 15%-20% in a year, although some of the written agreements relating to the cattle purchases ("livestock contracts") themselves guaranteed up to 32% in annual profits.

4. Agridime represented that the customers' funds would be used only for the purchase, raising and feeding of the purchased cattle. Instead, among other things, because Agridime did not buy the number of cattle required to fulfill its obligations under the livestock contracts, Agridime had to use recent customers' funds to pay the guaranteed profits of earlier purchasing customers. In addition, upon information and belief, customers' funds were also used to pay approximately $11 million in undisclosed commissions to Agridime personnel, including to Defendant Link, his wife, and Defendant Wood.

5. During the period from December 1, 2022 to September 30, 2023, upon information and belief, Agridime used customer funds from the sale of new cattle to pay previous customers' principal and returns, in the manner of a Ponzi scheme.

6. By virtue of this conduct, and as more fully set forth below, Defendants have engaged, are engaging, and/or are about to engage in violations of anti-fraud provisions of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1-26, and CFTC Regulations ("Regulations"),

17 C.F.R. Pts. 1-190 (2023), and specifically Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2023).

7. Unless restrained and enjoined by the Court, Defendants are likely to continue engaging in the acts and practices alleged in this Complaint or in similar acts and practices, and funds they have obtained fraudulently may be misappropriated or otherwise dissipated.

8. Accordingly, pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1, the CFTC brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the CEA and CFTC Regulations, and to enjoin them from engaging in any commodity-related activity, as set forth below. In addition, the CFTC seeks civil monetary penalties for each violation of the CEA and CFTC Regulations, and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

9. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).

10. Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive and other relief against any person whenever it appears to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

11. Livestock and livestock products are commodities as defined under Section 1a(9) of the CEA, 7 U.S.C. § 1a(9). Chicago Mercantile Exchange ("CME") livestock futures include the following: CME Feeder Cattle Futures and CME Live Cattle Futures.

12. Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), provides, in pertinent part, that:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with . . . a contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate[.]

13. The Commission issued Rule 180.1, 17 C.F.R. § 180.1 (2023), pursuant to Section 6(c)(1). Rule 180.1(a)(1)-(3) states, in pertinent part, that:

> (a) It shall be unlawful for any person, directly or indirectly, in connection with any . . . contract of sale of any commodity in interstate commerce, . . . , to intentionally or recklessly;
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

14. Defendants engaged in the acts and practices described in this Complaint using instrumentalities of interstate commerce, including but not limited to: the use of interstate wires for transfer of funds, U.S. mail, websites available throughout the United States, and email and phone communications with victims throughout the United States.

15. Venue lies properly in this District pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e), because Defendants transacted business in this District, and certain of the acts and practices in violation of the CEA and CFTC Regulations, occurred, are occurring, or are about to occur within this District, among other places. Venue also lies properly in this District pursuant

4

to 17 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and at least two of the Defendants, Agridime and Wood, reside in this District.

### III.    PARTIES

16. Plaintiff **Commodity Futures Trading Commission ("Commission" or "CFTC")** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the CEA and the CFTC Regulations promulgated thereunder.

17. Defendant **Agridime LLC ("Agridime")** is a limited liability company that was organized in Texas in 2017 by its two co-founders, Defendants Link and Wood, who jointly control or have controlled Agridime, each owning at least 45 percent of Agridime. During the Relevant Period, Agridime conducted business, among other ways, through the website "[www.agridime.com](www.agridime.com)". According to corporate records, the principal office of Agridime was located at 3000 South Hulen Street, Suite 124, in Fort Worth, Texas. Agridime purports to be a beef supply chain company that actively oversaw the raising of cattle with warehouses in Arizona, Kansas and Texas.

18. Defendant **Joshua Link,** the co-founder, managing member and Executive Director of Agridime, jointly controls or has controlled Agridime with Wood. In testimony to state regulators, Link testified that his Executive Director role was similar to that of a CEO. During the Relevant Period Link oversaw all of the sales and business operations of Agridime and had (along with Wood) decision making authority for Agridime. Link testified that he and Wood are "where the buck stops" with regard to decision-making at Agridime. Link accepted the livestock contracts and signed the livestock contracts on behalf of Agridime. Link decided if the profit amount on a particular livestock contract should be increased above the usual

guaranteed amount.  He was a signatory on Agridime bank accounts.  Link resides in Gilbert, Arizona.

19. Defendant **Jed Wood**, the co-owner, President and managing member of Agridime, jointly controls or has controlled Agridime with Link.  During the Relevant Period Wood controlled the bank accounts maintained by Agridime and was a signatory on those accounts for Agridime.  Wood resides in Fort Worth, Texas.

### IV.   FACTS

#### A.  Link and Wood Co-Founded and Jointly Control Agridime

20. Link and Wood co-founded Agridime in 2017 and during the Relevant Period were managing members of Agridime, signatories on Agridime's bank accounts and each owned at least 45 percent of Agridime.

21. Link was also the Executive Director of Agridime, a role he described in testimony as similar to that of a CEO.  Link oversaw all of the sales and business operations of Agridime and had decision making authority for Agrimide.  Link testified that he and Wood are "where the buck stops" with regard to decision-making at Agridime.  Link solicited customers, trained salespersons, accepted the livestock contracts and signed the livestock contracts on behalf of Agridime. Wood served as the Operations Director of Agridime and controlled Agridime's livestock operations and finances.  He signed checks on behalf of Agridime, including but not limited to payments to customers, so Wood knew or had reckless disregard for the truth about the Ponzi payments.

#### B.  Fraudulent Solicitations for Agridime's Livestock Scheme

22. Agridime marketed itself to the public and attempted to solicit potential buyers of cattle through Agridime's website and advertisements on social media, including Facebook and an Agridime YouTube channel. These social media advertisements were designed to lure victims

into contact with Agridime's website, which solicited victims to transfer their funds to Agridime under the ruse of buying cattle.

23. As of at least April 2023, if not earlier, Agridime's website represented that purchasers of cattle would "[m]ake 15-20% Yearly Returns and Help Us Produce Farm Fresh Beef."

24. Agridime's website misleadingly represented that cattle purchasers' funds would be used solely for the purchase and raising of cattle, including through its prominent display of the message: "Buy Live Cattle. Have you ever wanted to make money raising cattle without having to do all the work?"

25. Agridime's website further represented that Agridime "suppl[ies] retails [sic] outlets, meat distributors and restaurant food service companies with farm fresh beef. We are inviting individuals and organizations to purchase cattle with us in order to supply beef to these customers."

26. Agridime's website falsely claimed that all the money paid by purchasers of cattle would go towards the purchase of cattle and cattle-related expenses. The website described the financial breakdown of the cattle purchases as follows:

> The customer purchases cattle from us for $2,000 per head. That $2,000 is used to purchase one steer or heifer, feed that animal to finish, fully process the beef into retail packaging, and then ultimately sell the beef.

27. In return, Agridime's website promised that purchasers of livestock contracts would receive a guaranteed return: "All cattle purchased during Q2 of 2023 will be guaranteed 15-20% yearly profits."

28. Agridime's website deceptively marketed this scheme as a three-step process:

> **Step One**. We are offering cattle for sale at $2,000 per calf. Each calf is contracted into our proprietary beef supply chain. All cattle

7

> purchased during Q2 of 2023 will be guaranteed 15-20% yearly profits.  Ask us about a higher guaranteed return for purchases of 50 head or more.  Each calf purchased will be raised and finished on our partner farms in Kansas until they are ready to go to the butcher.
>
> **Step Two**.  Once your cattle have been processed we sell the beef to our online store and grocery store customers.  All of this results in a fair price for anyone who purchases Agridime beef, and a generous profit for you as the owner of the cattle.  All customers that purchase cattle are issued a contract at the time of purchase certifying and describing payment of cattle contract profits.
>
> **Step Three.**  We look forward to discussing the opportunity with you further!  Feel free to reach out at cattle@agridime.com or make your first cattle purchase below.

29. Agridime's website further attempted to induce investments from victims through its claim of "Proven Results," stating that "our customers averaged over 20% profit on more than 5,000 head of cattle raised in our system."

30. By at least December 2023, Agridime's website no longer referenced the purchase of cattle, but instead claimed that potential investors could work with the Company to "buy or sell your finished cattle" through their help with "backgrounding, spot contracts, and hedging your calves as finished cattle."

31. Agridime also created and maintained a channel on YouTube.  In video advertisements posted to the Agridime YouTube channel in 2023, Agridime made false statements regarding cattle purchases, including that all money invested for such purposes would be used for cattle-related expenses:

> Thank you for your interest in purchasing cattle with us.  Here's how the financials break down for the 15-20% return on our cattle contracts.  ***The customer purchases cattle from us for $2,000 per head.  That $2,000 is used to purchase one steer or heifer, feed that animal to finish, fully process the beef into retail packaging, and then ultimately sell the beef.***  Each steer or heifer purchased will yield an average of 500 pounds of retail-able beef products.  Our

average sale price for those products is $6 per pound.  ***With that, our average top-line revenue per head is $3,000.  This results in $300-$400 per head profit (15-20% return) for the customer, and $600 per head profit or (30% return) for Agridime.***  Visit www.agridime.com/buy-cattle-here or email info@agridime.com to purchase today.  Also feel free to call us at 682-247-9598.
(Emphasis added)

32. Agridime's false and misleading videos were further shared on social media, including on Agridime's Facebook page.

33. For example, Agridime attempted to solicit victims through a post on Agridime's Facebook page, which stated that individuals could "Learn how to make 15%-20% yearly returns by purchasing cattle with us" and included the video described above.  Agridime's Facebook message also directed potential buyers to a link where they could "purchase cattle today."

34. Agridime's website, YouTube channel and Facebook page did not disclose that Agridime was regularly using cattle purchase customers' funds to pay other customers' principal and returns and to pay undisclosed commissions.

**C. Victims Sign Livestock Contracts Purporting to Purchase Livestock with Guaranteed Annual Returns**

35. After cattle purchasers sent their money to Agridime it provided the buyers with one-page livestock contracts, which included assurances that "Agridime is licensed and bonded in accordance with the USDA."

36. For example, one livestock contract stated as follows:

LIVESTOCK CONTRACT #7409

This Contract entered into on May 3rd, 2023 by and between [Customer name] hereinafter called Seller, and Agridime Of Fort Worth, TX hereinafter called Buyer.  The Seller agrees to sell and Agridime (the "Buyer") agrees to purchase from the Seller the below described cattle in accordance with the preceding terms and conditions, which are legally binding on the Seller and Buyer.  Agridime is licensed and bonded in accordance with the USDA.  All cattle are insured for death loss.  In the event of death, Agridime will replace any lost cattle and maintain the guaranteed return set forth below.

9

| Number of Head | Sex | Breed, Sire & Dam Breakdown or Color | Base Wt (lbs) | Price | Delivery Schedule And Dates |
|---|---|---|---|---|---|
| 50 | Steers And/Or Heifers | Home raised calves, Angus Based | 1,300-1,500 | $2,400 per head | Freight on Buyer-(redacted) : May 3rd, 2023 to May 13th, 2024 |

CONTRACT TERMS: [Customer] agrees to purchase fifty steers and/or heifers for $2,000 per steer or heifer ($100,000). Agridime agrees to pay 20% per year profit on those cattle. Guaranteed yearly profits of 20%. Contract to be paid 7-10 business days after the final date set forth in the above delivery schedule. Payment to be made by Agridime via electronic funds transfer. Contract terms are payable 12 months post the date set forth in this contact, or upon receipt of funds from the aforementioned "seller".

37. Upon information and belief, the contract terms quoted above appear to be standard across Agridime livestock contracts, except for variations in the price per head and the percentage of guaranteed profit, which ranged from 15% to 32%. Each contract also specified the "number of head" of cattle, sex, "breed, sire, & dam breakdown or color," base weight (lbs), price, and delivery schedule or dates, typically one year from the date of the contract.

38. From at least August 2023, Agridime also offered a new variant of its livestock contract, called a Commercial Livestock Contract, the terms of which read as follows:

COMMERCIAL LIVESTOCK CONTRACT #38011

This Livestock Contract is entered into as of the **16th** day of **August**, 2023, by and between [Customer], having his/her principal place of residence/business located at [Customer Address] and Agridime, LLC having its principal place of business located at 3000 S. Hulen Street, Suite 124, Fort Worth, Texas, 76109, both of whom agree to be bound by this Contract.

WHEREAS [Customer] desires to purchase cattle from Agridime, LLC and leave such cattle in the care and custody of Agridime, LLC for one year; and

WHEREAS Agridime, LLC desires to purchase the cattle back one year from the date of this Contract, at a specified price, [Customer] and Agridime, LLC mutually desire to enter into an arrangement according to the terms and conditions herein.

NOW, THEREFORE, in consideration of the mutual covenants and promises made by the parties hereto, [Customers] and Agridime, LLC covenant and agree as follows:

1. **PURCHASE OF CATTLE BY [CUSTOMER]:** Simultaneous with the date of this Contract, [Customer] has purchased from Agridime, LLC and paid in full for the purchase of **Twenty-three (23) head of cattle**, at the cost of **$4,500** each, resulting in a total sale price of **$103,500.** The cattle purchased from Agridime, LLC under this Contract shall remain in the care and custody of Agridime, LLC. Agridime, LLC is licensed and bonded in accordance with the regulations of the United States Department of Agriculture (USDA). All cattle owned by [Customers] in the care and custody of Agridime, LLC are insured for death loss by a policy owned by Agridime, and in the event of death Agridime will replace any lost cattle and maintain the repurchase price set forth in Section 2.

2. **REPURCHASE OF CATTLE BY AGRIDIME, LLC:** <u>One year</u> from the date of this Contract or date of receipt of funds, Agridime, LLC will buy back (repurchase) the cattle owned by [Customers] under this Contract. Agridime, LLC will pay the original total purchase price for the cattle paid by [Customers] specified in Section 1, plus **$1,000 per Cow Calf pair**, resulting in a total purchase price of **$126,500.**

3. **TERMS OF PAYMENT.** Agridime, LLC will remit to [Customer] the total purchase price specified in Section 2 within 7 to 10 business days, either by ACH or Wire Transfer.

4. **NO MODIFICATION UNLESS IN WRITING.** No modification of this Contract shall be valid unless in writing and agreed upon by all named Parties.

5. **ENTIRE AGREEMENT.** This Contract represents the full understanding of the Parties and shall supersede all previous oral or written agreements regarding the subject matter herein.

6. **APPLICABLE LAW.** This Contract and the interpretation of its terms shall be governed by and construed in accordance with the laws of the State of Texas and subject to the exclusive jurisdiction of the federal and state courts located in Tarrant County, Texas.

IN WITNESS IN THEREOF, each of the Parties has executed this Livestock Contract as of the **16th** day of **August 2023.**

39. The purchases of livestock from Agridime constitute contracts of sale of commodities in interstate commerce.

40. Agridime owned an insufficient amount of cattle to support those cattle sales and to fulfill the company's obligations under the livestock contracts. Upon information and belief, as of December 2023, Agridime had less than half of the cattle needed to fulfill its contractual obligations. As a result, Agridime has only been able to return principal and pay promised customer returns by paying customers with new customers funds.

41. Additionally, Agridime's one-year contracts made promises to and assured the buyers that they would maintain the promised rate of return regardless of the state of the underlying cattle they were claiming to purchase, stating that "[a]ll cattle are insured for death loss" and "[i]n the event of death, Agridime will replace any lost cattle and maintain the guaranteed return set forth below." Moreover, Defendant Link testified that "we have done our best to mitigate every risk point in our supply chain to make it a no-risk purchase".

42. Nowhere in the contracts did Agridime state that funds would go towards costs other than cattle, or that funds would be used to enrich the Defendants and other salespersons in the form of commissions, or to pay earlier contracting customers.

**D. Customer Funds Used Contrary To Agridime's Representations**

43. During the Relevant Period, Defendants Link and Wood jointly controlled Agridime and were the sole decision makers for Agridime. Because Link and Wood knowingly or recklessly induced the acts described herein and did not act in good faith, all acts of Agridime alleged herein are attributed to Defendants Wood and Link. Conversely, all acts of Defendants Link and Wood alleged herein are attributed to Agridime.

44. Defendants' bad faith is evidenced by the use of customers' funds contrary to representations made in the solicitation of livestock contract customers. Specifically, despite Agridime's representations that customers' funds would be used only for cattle and cattle-related expenses, upon information and belief, Agridime actually used newer customer funds to pay

earlier customers' principal and returns, and used customers' funds to pay undisclosed commissions, including commissions paid to at least one Agridime salesperson, to Defendant Link and his wife, and to Defendant Wood.

45.     During the Relevant Period, Agridime's assets were insufficient to cover its livestock contract obligations.  As of at least May 2023, and contrary to its promises to customers, Agridime had acquired fewer cattle than it sold to customers.  Upon information and belief, as of December 2023, Agridime had less than half of the cattle needed to fulfill its contractual obligations.  Because of the cattle shortfall, Agridime failed to generate sufficient profits to repay livestock contract customers.  During the period from December 1, 2022 to September 30, 2023, upon information and belief, Agridime used customer funds from the sale of new livestock contracts to pay previous customers' principal and returns.

46.     Upon information and belief, as of September 5, 2023, Agridime's obligations from livestock contracts required Agridime to pay approximately $123 million in principal plus $24 million in guaranteed profits.  However, upon information and belief, Agridime had cash balances of less than $1.5 million as of September 30, 2023, which were insufficient to meet those contractual obligations without new customers' funds.

47.     Through May 2023, without the livestock contract customers' knowledge and authorization and contrary to the represented express use of the customers' funds, Agridime paid aggregate commissions of over $11.1 million, including undisclosed commissions of $5.6 million to a salesperson, $1.3 million to Link and his wife, and $1.3 million to Wood.

48.     Link testified in one state regulator's action that Wood and an assistant oversaw the deposits into and payments out of Agridime's various bank accounts and Link testified that "I also kind of just –account for that as well" (in reference to outflow from the accounts).  Link

13

testified that Wood and the assistant constantly monitored what came into and out of Agridime's bank accounts.

49. Link also testified that the standard commissions for selling cattle were between five and ten percent and his testimony indicates that Link knew commissions were being paid.

50. Since undisclosed commissions were paid to Link and Wood, Defendants knew that undisclosed commissions were being paid.

51. Upon information and belief, because Link solicited customers, trained salespersons and accepted and signed the livestock contracts, Link knew or had reckless disregard for the truth about the misrepresentations and omissions made in soliciting livestock contract customers.

52. Upon information and belief, because Wood oversaw Agridime's finances and was primarily responsible for its bank accounts, including payments to customers, Wood knew or had reckless disregard for the truth about the Ponzi payments.

**E. Prior State Securities Actions and Securities and Exchange Commission Action in This District**

53. As alleged above, Agridime solicited customers for its livestock contracts from at least fourteen states, including but not limited to Arizona, Alabama, Arkansas, Colorado, Indiana, Kansas, Kentucky, Maryland, North Dakota, Oklahoma, South Dakota, Texas, Washington and Wisconsin.

54. In April 2023, the Arizona Corporation Commission issued a temporary cease-and-desist order relating to the livestock contracts barring Agridime and Link from, among other things, selling unregistered securities and committing securities fraud.

55. In May 2023, the North Dakota Securities Commission ordered Agridime and Link to cease and desist from selling unregistered securities, acting as an unregistered broker-dealer and engaging in securities fraud relating to the livestock contracts.

56. On or about December 11, 2023, the Securities and Exchange Commission (SEC) filed a complaint in this district relating to the livestock contracts, together with an emergency *ex parte* motion seeking a temporary restraining order, preliminary injunction and asset freeze against Agridime, Link and Wood.

57. On December 11, 2023, the SEC's application for a temporary restraining order for the appointment of a receiver as to Defendants Agridime, Link and Wood in the SEC action, was granted. Additionally, the SEC obtained an asset freeze, and other emergency relief. On January 8, 2024, a preliminary injunction was granted in the SEC action continuing the relief set forth in the temporary restraining order.

58. On April 25, 2024, the Court partially resolved the SEC action by entry of consent final judgments against Defendants Link and Wood, which provided for disgorgement and civil monetary penalties in amounts to be determined by the Court upon motion of the SEC, and restrained Defendants Link and Wood from future violations of certain provisions of the federal securities laws and regulations.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

### COUNT I – AGAINST ALL DEFENDANTS

**Fraud in Violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2023)**

59. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

60. Defendant Agridime, intentionally or recklessly, in connection with contracts of sale of commodities in interstate commerce,

> Used or employed, or attempted to use or employ, a scheme or artifice to defraud;
>
> Made, or attempted to make untrue or misleading statements of material fact, or omitted to state material facts necessary to make the statements made not untrue or misleading; and/or
>
> Engaged in, or attempted to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on Defendants' customers.

61. Agridime's fraudulent conduct, as alleged herein, violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) (2023).

62. The acts, omissions, and failures of Defendants Link and Wood and other officials, agents, or persons acting for Agridime described in this Complaint, including sales representatives or other agents, occurred within the scope of their employment, agency, or office with Agridime, and are therefore deemed to be the acts, omissions, and failures of Agridime by operation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2023). Agridime is liable for the violations committed by its agents, officers and employees.

63. Defendants Link and Wood controlled Agridime directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations by Agridime alleged in this count. As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b), Link and Wood are liable for the violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) by Agridime alleged in this count as controlling persons.

64. Each fraudulent or deceptive act by Defendants, including without limitation those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

## VI. RELIEF REQUESTED

The CFTC respectfully requests that this Court, as authorized by Section 6c of the CEA, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

i. An order finding that Defendants violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2023);

ii. An order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with Defendants who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

   1) Engaging in conduct in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3);

   2) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the CEA, 7 U.S.C. § 1a(40));

   3) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2023)), or livestock, livestock products or cattle that are commodities for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

    4)      Having any commodity interests, or livestock, livestock products or cattle that are commodities, traded on any Defendant's behalf;

    5)      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests, livestock, livestock products or cattle that are commodities;

    6)      Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests, livestock, livestock products or cattle that are commodities;

    7)      Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in CFTC Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) and

    8)      Acting as a principal (as that term is defined in CFTC Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2023)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9);

iii. An order directing Defendants and any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the CEA or Regulations, as described herein, during the Relevant Period, including pre-judgment and post-judgment interest;

iv. An Order requiring Defendants and any third-party transferee and/or successors thereof to make restitution, pursuant to such procedure as the Court may order, to persons who have sustained losses proximately caused by Defendants' violations of the CEA or Regulations, as described herein, including pre-judgment and post-judgment interest;

v. An order directing Defendants to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Defendants and any of the customers whose funds were received by Defendants as a result of Defendants' violations of the CEA or Regulations, as described herein;

vi. An order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the CEA, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, title VII, § 701, 129 Stat. 584, 599-600, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2023), for each violation of the CEA or CFTC Regulations;

vii. An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2023); and

viii. An order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: May 10, 2024　　　　　Respectfully submitted,

　　　　　　　　　　　　　　Attorneys for Plaintiff,
　　　　　　　　　　　　　　COMMODITY FUTURES TRADING COMMISSION

　　　　　　　　　　　By:　　/s/ Janine Gargiulo
　　　　　　　　　　　　　　Janine Gargiulo
　　　　　　　　　　　　　　Senior Trial Attorney, NY Bar No. 2429520 (*pro hac vice pending*)
　　　　　　　　　　　　　　(jgargiulo@cftc.gov)

　　　　　　　　　　　　　　Nicole Buseman
　　　　　　　　　　　　　　Trial Attorney, NY Bar No. 5119193 (*pro hac vice pending*)
　　　　　　　　　　　　　　(nbuseman@cftc.gov)

　　　　　　　　　　　　　　David W. MacGregor
　　　　　　　　　　　　　　Chief Trial Attorney
　　　　　　　　　　　　　　NJ Bar No. 016401982 (*pro hac vice pending*)
　　　　　　　　　　　　　　(dmacgregor@cftc.gov)


　　　　　　　　　　　　　　Commodity Futures Trading Commission
　　　　　　　　　　　　　　Ted Weiss Federal Building
　　　　　　　　　　　　　　290 Broadway, 6th Floor
　　　　　　　　　　　　　　New York, NY 10007
　　　　　　　　　　　　　　(646)746-9700